**Robison v. DG Retail, LLC, No. CV-25-03618-PHX-DGC**

**EXHIBITS TO DECLARATION OF SEAN A. WOODS (EXHIBIT 2)**

**Part 2 of 8: Index**

Exhibit F: Atlas Neurosurgery and Spine Records through May 14, 2026

Exhibit G: Notices of Claim Status, June 10, 2026

Exhibit H: Notice of Removal, Peoples v. DG Retail, LLC (S.D. Ill.)

Exhibit I: Dollar General Corporation Form 10-K Cover Page

Exhibit J: Notice of Claim Status, August 22, 2022

Exhibit K: Decision Upon Hearing and Findings and Award, December 29, 2023

# EXHIBIT F

Atlas Neurosurgery and Spine Records through May 14, 2026

| PATIENT | | FACILITY | ENCOUNTER | |
|---|---|---|---|---|
| **MARK ROBISON** | | **Atlas Neurosurgery and Spine Center** | **Office Visit** | |
| DOB | [redacted] | T (602) 975-0123 | NOTE TYPE | SOAP Note |
| AGE | 60 yrs | F (623) 900-7937 | SEEN BY | Abhishiek Sharma MD |
| SEX | Male | 8402 E. Shea Blvd | DATE | 05/13/2026 |
| PRN | RM842446 | Suite 100 | AGE AT DOS | 60 yrs |
| | | Scottsdale, AZ 85260 | Electronically signed by Abhishiek Sharma MD at 05/14/2026 05:16 pm | |

## Chief complaint

WC* REMOTE 4 WK F/U -CR (Appt time: 5/13/2026 10:15:00 AM) (Arrival time: 10:32 AM)

### Patient identifying details and demographics

| | | | | | |
|---|---|---|---|---|---|
| FIRST NAME | MARK | SEX | Male | RACE | - |
| MIDDLE NAME | - | DATE OF BIRTH | [redacted] | ETHNICITY | - |
| LAST NAME | ROBISON | DATE OF DEATH | - | PREF. LANGUAGE | - |
| SSN | [redacted] | PRN | RM842446 | STATUS | Active patient |

#### CONTACT INFORMATION

| | | | |
|---|---|---|---|
| ADDRESS LINE 1 | 33229 W CALDWELL ST | CONTACT BY | - |
| | | EMAIL | markyrobinson1984@gmail.com |
| ADDRESS LINE 2 | - | | |
| CITY | Tonopah | HOME PHONE | - |
| STATE | AZ | MOBILE PHONE | (602) 626-0422 |
| ZIP CODE | 85354 | OFFICE PHONE | - |
| | | OFFICE EXTENSION | - |

#### FAMILY INFORMATION

| | | | |
|---|---|---|---|
| NEXT OF KIN | - | PATIENT'S MOTHER'S MAIDEN NAME | - |
| RELATION TO PATIENT | - | | |
| PHONE | - | | |
| ADDRESS | - | | |

#### PATIENT NOTES

Referred by: Palo Brea and Spine Dr. Jeffrey Scott p: 602-368-3600 f: 602-368-3235 Carrier: Sedgwick Claim: 7211446 DOI:01/07/2022 NEW Adjuster: Melissa Casady Melissa.Casady@sedgwick.com NEW ATTORNEY: Chris Gulinson P: 602-254-1977 E: OLD Adjuster: Linda Scott P: 480-606-5580 F: 866-548-2637 Email: Linda.Scott@sedgwick.com NCM: None Attorney: Shawn Woods/ badger law P: 4808568128 F: 4809995169 FAXED TO ASH AT MATT FENDON 602-900-0123 IN CARE OF SUSAN AND RON HOWARD 4/8/24- Called pt to confirm appt. for tomorrow no answer lvm-av 4/22/2024-I called Fairmont ins and spoke to Carmen N. I provided the WC ins info-LZ 5/20/24- LVM to reschedule post-op for next day due to Memorial Day office closed. -CS 5/29/2024-LVM to ask if X-rays were completed. The approval is uploaded to docs. I'm not seeing the result son the SM portal-LZ 6/12/2024- Medications need to be billed through WC and not insurance. I informed the patient to call their attorney. -HRC 11/24/25- Sent ovn 11/17/25 to 602-900-0123 CR

20260528035166

## Active insurance

### PRIMARY PAYER - MEDICAL

| | | | |
|---|---|---|---|
| PAYER | Sedgwick CMS | INSURED ID NUMBER | 7211446 |
| PRIORITY | Primary | GROUP NUMBER | - |
| TYPE | Other | EMPLOYER NAME | - |
| RELATIONSHIP TO INSURED | Self | INSURANCE PAYMENT TYPE | Copay |
| START DATE | 01/07/2022 | PAYMENT TYPE | Fixed |
| END DATE | - | COPAY AMOUNT | 0 |
| | | STATUS | Active |

## Inactive insurance

## Payment information

| | | | |
|---|---|---|---|
| PAYMENT PREFERENCE | Primary insurance | DATE OF BIRTH | - |
| PATIENT'S RELATIONSHIP TO GUARANTOR | - | SEX | - |
| | | SOCIAL SECURITY NUMBER | - |
| GUARANTOR NAME | - | PRIMARY PHONE NUMBER | - |
| GUARANTOR ADDRESS | - | SECONDARY PHONE NUMBER | - |

## Vitals for this encounter

No vitals recorded

## Diagnoses

Was diagnosis reconciliation completed?
**Yes, reconciliation performed**

| Current | ACUITY | START | STOP |
|---|---|---|---|
| (M54.12) Radiculopathy, cervical region | | | |
| (M54.2) Cervicalgia | | | |
| (G95.9) Disease of spinal cord, unspecified | | | |

| Historical | ACUITY | START | STOP |
|---|---|---|---|
| No historical diagnoses | | | |

## Drug Allergies

Was medication allergy reconciliation completed?
**Yes, reconciliation performed**

| Active | SEVERITY/REACTIONS | ONSET |
|---|---|---|
| Methocarbamol | Severe<br>Anaphylaxis | - |

| Inactive | SEVERITY/REACTIONS | ONSET |
|---|---|---|
| No inactive drug allergies recorded | | |

## Food Allergies

| Active | SEVERITY/REACTIONS | ONSET |
|---|---|---|
| No Active food allergies recorded | | |

| Inactive | SEVERITY/REACTIONS | ONSET |
|---|---|---|
| No inactive food allergies recorded | | |

## Environmental Allergies

| Active | SEVERITY/REACTIONS | ONSET |
|---|---|---|
| No Active environmental allergies recorded | | |

| Inactive | SEVERITY/REACTIONS | ONSET |
|---|---|---|
| No inactive environmental allergies recorded | | |

## Immunizations

| DATE | VACCINE | SOURCE | LOT NUMBER | EXPIRES | COMMENT |
|---|---|---|---|---|---|
| No immunizations recorded for this patient. | | | | | |

## Advance Directive

| DIRECTIVE | RECORDED |
|---|---|
| No advance directives recorded for this patient. | |

## Subjective

The patient is a 58 yrs old who presents for evaluation of neck and bilateral upper extremity weakness. The patient states that he was lifting cases of water off a dolly when he felt a pop in his neck. He states that he was walking across the store when he felt numbness to his upper extremities. He was evaluated at Concentra and Banner Estrella, where he underwent diagnostic imaging. An MRI of his shoulder was obtained at the time, and the patient was referred to Dr. Greenfield. Dr. Greenfield believed his symptoms were arising from his cervical spine. He underwent an MRI of his cervical spine and an EMG of his upper extremities. His EMG was done on 2/1/2023 which revealed right C5-6 radiculopathy versus severe right upper trunk plexopathy and mild left C7 radiculopathy. He underwent and IME with Dr. Theiler, who recommended a neurology and orthopedic evaluation. He was evaluated by Dr. Eiffler who recommended neurosurgical evaluation given his cervical findings. Currently, the patient for significant neck pain and bilateral upper extremity weakness. He also reports headaches and "cramping" to his upper extremities. He has noticed atrophy to his right arm. He said that he has difficulty buttoning his shirts and lifting his arms above shoulder level. Of note, the patient has been experiencing urinary incontinence which he mentioned to Dr. Scott. At the time Dr. Scott recommended the patient to go to the nearest emergency department for further evaluation. He was evaluated at St. Joseph's Medical Center where he underwent work up for his urinary incontinence. He is a former smoker and states that he quit November 2023. The patient states that these symptoms have been long-standing and non-responsive to significant physical therapy and medication. The patient denies any bowel or bladder issues. No fecal incontinence is reported. A routine Neurosurgical evaluation is now being requested. The patient reports significant limitations in activities of daily living including but not limited to household chores.

5/30/2024
The patient presents in interval follow-up, now 4 weeks status post C5-7 ACDF. He states he experienced significant post-surgical pain and difficulty swallowing for approximately 10 days after surgery. However, these symptoms have gradually improved. He states his symptoms remain generally unchanged in comparison to his preoperative symptoms. He does report increased muscle spasms through his right upper extremity as well as numbness to his left hand. He admits he cannot discern, which symptoms have been long standing and which symptoms are new as he has experience such diffuse symptoms over the last 2 years. He is otherwise stable.

6/14/2024
The patient presents in interval follow-up. He states he "feel like shit." He reports left sided neck spasms, continued left arm pain, swelling, nausea and generalized pain. He states he is miserable. He reports taking the Percocet at night, sparingly. He did not pick up his muscle relaxant from the pharmacy. He continues to feed his horses and take care of things around the house. He is concerned he will "be like this forever." He would like to try acupuncture if he finds the right person He is otherwise stable.

20260528035166

7/19/2024
The patient presents in interval follow up. He states he still does not feel great. He continues to have some hoarseness and feels like he has dull neck pain. He states his arm strength and range of motion has not changed. He has not attended physical therapy thus far. He states muscle relaxants and the medrol dosepak make him nauseas and vomit. He states he has taken the hydrocodone sparingly for pain at night. He is otherwise stable.

9/13/2024
The patient presents in interval follow up. He states he is miserable. He reports feeling like an elephant is sitting on his head. He complains of significant migraines, bilateral upper extremity muscular atrophy, and generalized pain. He states he is "miserable." He states he is having trouble getting an appointment with Dr. Scott. He obtained imaging prior to today's visit which was reviewed with him.

10/18/2024
The patient presents in interval follow up. His symptoms are overall unchanged. He is planning on calling HelpTherapy back to schedule a counseling session. He saw Dr. Shayya on 9/16 for migraines who started him on an injection. He has a follow up in 1 month. He sees Dr. Scott at the end of this month for pain management. He does not want injections. He states his left arm is stronger but he is still unable to lift either arm out to the side. He states he is overall "miserable." He would like another evaluation on his shoulder as he states he had a rotator cuff tear after his injury. He would also like to restart physical therapy.

11/15/2024
The patient presents in interval follow up. The patient states his migraines have improved since his last visit. He feels 50% better since his migraines have stopped. He is very thankful Dr. Shayya recommended the injection. He established with Dr. Scott who recommended a cervical stimulator trial. The patient had several questions regarding the stimulator which were answered for him today. He would like a referral to Eifler to evaluate his shoulders. He states he has seen him before at the beginning of his injury and would like to stay with the same surgeon. He has started physical therapy and likes his therapist, Chris. He states he feels like his neck is stronger.

12/27/2024
TeleHealth Consent: The patient is called for a TeleHealth encounter. Prior to continuing video call, patient is verified using two factors. Additionally, patient is reminded that all clinical decision making is being based upon the conversation without a complete physical exam. It is discussed that further evaluation may be needed. Patient confirms understanding and consents to telehealth encounter.

The patient presents in interval follow up. He states his migraines are significantly improved since seeing Dr. Shayya. He is very grateful for the relief. He is planning to schedule a follow up with Dr. Shayya soon. He is participating in physical therapy and is happy with his therapist, Chris. He continues to struggle with his upper extremity atrophy but does think physical therapy is helping. He was unable to see Dr. Eifler to evaluate his shoulder due to approval. His psychology referral was also denied. He is contemplating the cervical spinal cord stimulator previously discussed with Dr. Scott. He states he thinks he has an IME next month.

1/24/2025
TeleHealth Consent: The patient is called for a TeleHealth encounter. Prior to continuing video call, patient is verified using two factors. Additionally, patient is reminded that all clinical decision making is being based upon the conversation without a complete physical exam. It is discussed that further evaluation may be needed. Patient confirms understanding and consents to telehealth encounter.

The patient presents in interval follow up. He had an IME 2 weeks ago. He states physical therapy does help but his arms continue to be significantly weak. He would like to have his shoulder evaluated by Dr. Eifler before proceeding with further procedures. He would also like to see a counselor which was previously denied. His headaches continue to be well managed.

2/28/2025
The patient presents in interval follow up. His IME was available to review today. He had another IME yesterday with neurology, Dr. Khan. His weakness is worse this week but overall enjoys going to physical therapy to help recondition his arms as much as he can. He has not had migraines with the injections from Dr. Shayya. He states he does not want a cervical spinal cord stimulator at this time but does want to continue cervical physical therapy, get his shoulders evaluated, continue seeing neurology for headache management and start seeing a counselor which has not been approved.

3/28/2025

The patient presents in interval follow up. His neurology IME from Dr. Kahn was available for review today. His right arm has had increased muscular spasms lately which create increased neck pain, headaches, and most recently nausea from his headaches. His blood pressure has been higher lately due to his pain. He is struggling more to lift dog food. He is continuing discussions with his attorney regarding his approval for a shoulder re-evaluation. He is otherwise stable.

6/27/2025
The patient presents in interval follow up. His overall upper extremity weakness and atrophy are unchanged. He is undergoing physical therapy consistently which he enjoys. He has trouble following up with Dr. Shayya due to scheduling but continues to have significant improvement with his migraines. He was supposed to have a court hearing 3 weeks ago but was postponed. He is waiting to hear back on a new date. He was recently assaulted by his landlord and is wearing a boot for a left ankle injury. He is working with his attorney regarding his case to get his shoulder evaluation approved.

8/8/2025:
The patient presents in interval follow-up. He states that his right arm weakness has significantly worsened over the last 4 days. He is unable to lift his right arm and has significant weakness. He is right hand dominant and has been unable to use his right arm. He has been experiencing neck pain and spasms. He denies any recent viral, GI/GU/respiratory infection. He also has had difficulty regulating his body temperature. The patient states that he occasionally smokes marijuana. He is otherwise stable.

8/18/2025
The patient presents in interval follow-up. He states he continues to be bothered by significant weakness diffusely to his right upper extremity as well as to his left deltoid. He states his neck pain and muscle spasms remain bothersome. He is requesting additional medication for symptom relief. He completed updated imaging prior to the visit that was reviewed with him and is otherwise stable.

9/8/2025
The patient is called for a TeleHealth encounter. Prior to continuing the call, the patient is verified using two factors. Additionally, patient is reminded that all clinical decision making is being based upon the conversation without a complete physical exam. It is discussed that further evaluation may be needed. Patient confirms understanding and consents to a telehealth encounter.

The patient presents in routine follow-up. He continues to report right greater than left upper extremity weakness as well as significant spasms and cramping. He states his left upper extremity has these symptoms as well, but not as severe. He states he is also becoming overheated and recently "passed out". His recent CT report was available for review. He is otherwise stable.

10/13/2025
The patient presents in routine follow-up. He states he underwent cupping to his right neck and shoulder, which did provide some symptom relief. He notes he can somewhat move his arm better. He was not able to undergo his recommended EMG as he was sick with the flu. He's in the midst of rescheduling this. He also reports he has a hearing on 12/3. He denies other new or worsening neurological symptoms at this time.

11/17/2025
The patient is called for a TeleHealth encounter. Prior to continuing the call, the patient is verified using two factors. Additionally, patient is reminded that all clinical decision making is being based upon the conversation without a complete physical exam. It is discussed that further evaluation may be needed. Patient confirms understanding and consents to a telehealth encounter.

The patient presents in routine follow-up. He states he is noticing increased neck tension and arm pain. He has not yet completed his upper extremity EMG, but will schedule this today. In addition, he states he is in the midst of finding a new attorney secondary to a conflict of interest with her current attorney. He has subsequently requested we stop communication with the current attorney on file. He is also attempting to follow-up with Dr. Eifler. He denies new or worsening neurological symptoms and is otherwise stable.
no show

12/22/2025
The patient is called for a TeleHealth encounter. Prior to continuing the call, the patient is verified using two factors. Additionally, patient is reminded that all clinical decision making is being based upon the conversation without a complete physical exam. It is discussed that further evaluation may be needed. Patient confirms understanding and consents to a telehealth encounter.

20260528803351 66
The patient presents in interval follow-up. He states his pain symptoms remain generally stable. He continues to report weakness to his upper extremities which impair his ability to reach overhead. He has not yet received approval to follow-up with Dr. Eifler. He completed an upper extremity EMG prior to the visit that was reviewed with him and is otherwise stable.

1/23/2026
The patient is called for a TeleHealth encounter. Prior to continuing the call, the patient is verified using two factors. Additionally, patient is reminded that all clinical decision making is being based upon the conversation without a complete physical exam. It is discussed that further evaluation may be needed. Patient confirms understanding and consents to a telehealth encounter.

The patient presents in routine follow-up. He states his symptoms remain unchanged. He continues to report right upper extremity numbness, "jerking", and spasms. He has multiple concerns in undergoing surgical intervention including his overall health, caring for his animals postoperatively, and receiving authorization for therapy or rehab postoperatively. He is in the midst of meeting with a new attorney later this week to further discuss. He denies other new or worsening neurological symptoms and is otherwise stable.

4/3/2026

The patient is called for a TeleHealth encounter. Prior to continuing the call, the patient is verified using two factors. Additionally, patient is reminded that all clinical decision making is being based upon the conversation without a complete physical exam. It is discussed that further evaluation may be needed. Patient confirms understanding and consents to a telehealth encounter.

The patient presents in interval follow-up. He states he has noticed increased spasms and intermittent numbness to his upper extremities. He states he is concerned he will not receive the care and support necessary to have a adequate recovery from a surgical intervention. He is also concerned with his age and other medical issues in undergoing a major spinal surgery and therefore does not wish to pursue a surgical intervention at this time. He states Dr. Eifler is not recommending surgical intervention at this time either. He denies other new or worsening neurological symptoms and is otherwise stable.

5/13/2026
The patient is called for a TeleHealth encounter. Prior to continuing the call, the patient is verified using two factors. Additionally, patient is reminded that all clinical decision making is being based upon the conversation without a complete physical exam. It is discussed that further evaluation may be needed. Patient confirms understanding and consents to a telehealth encounter.

The patient presents in routine follow-up with overall stable symptoms. He reiterates his wishes to avoid surgical intervention given his concerns with his current age and state of health as well as concerns in receiving lack of authorization for potential necessary care postoperatively as this was the case after his most recent surgical intervention. He denies other new or worsening neurological symptoms and is otherwise stable.

## Objective

**Exam:**
Deferred for telehealth

## Assessment

MRI cervical spine without contrast: I personally reviewed the images as well as the report.
INDICATION: Neck pain, injury January 2022, left arm radiculopathy, right arm spasm

COMPARISON: MRI cervical spine 2/24/2022

TECHNIQUE: Sagittal T1, sagittal STIR, sagittal and axial T2, and axial gradient echo images were obtained.

FINDINGS:

There is straightening of the cervical spine.

The vertebral bodies are normal in height. Facial shortening of the pedicles.

The disc spaces are desiccated at C3-4, C5-6 and C6/7. Inflammatory edema along the endplates at C5-6.

The paraspinal soft tissues are normal.

The spinal cord signal is normal.

LEVEL BY LEVEL:

C1-C2: No significant degenerative changes. No canal stenosis.

C2-C3: Mild to moderate bilateral facet and left-sided uncovertebral enlargement. 2 mm disc bulge. Moderate to severe left-sided neural foramen stenosis without spinal canal or right neural foramen stenosis.

C3-C4: Rightward directed 3 mm disc bulge with mild-to-moderate bilateral facet and right greater than left-sided uncovertebral enlargement. Moderate to severe right and mild-to-moderate left-sided neural foramen stenosis with mild spinal canal stenosis, unchanged.

C4-C5: Trace anterolisthesis of C4 on C5. 2 mm disc bulge and mild-to-moderate bilateral facet and uncovertebral enlargements. Moderate bilateral neural foramen stenosis without spinal canal stenosis, unchanged.

C5-C6: Retrolisthesis of C5 on C6. Mild spinal cord flattening. 5 mm ridge complex. Severe spinal canal stenosis. Bilateral uncovertebral enlargement and facet disease and severe bilateral neural foramen stenosis. There is encroachment on the exiting bilateral C6 nerve roots.

C6-C7: 5 mm ridge complex with moderate bilateral facet and uncovertebral enlargement. Moderate to severe bilateral neural foramen stenosis with moderate spinal canal and bilateral lateral recess stenosis, unchanged.

C7-T1: Unremarkable appearance of the disc. No significant facet joint degeneration. No spinal canal or neural foraminal stenosis.

IMPRESSION:

1. Stable exam. Spondylosis at C5-6 resulting in severe spinal canal stenosis with severe bilateral neural foramen stenosis, unchanged. There is encroachment on the exiting bilateral C6 nerve roots and mild spinal cord flattening.

2. Moderate to severe bilateral neural foramen stenosis with moderate spinal canal and bilateral lateral recess stenosis at C6/7, unchanged.

3. Moderate bilateral neural foramen stenosis at C4-5, stable.

4. Moderate to severe right and mild-to-moderate left-sided neural foramen stenosis with mild spinal canal stenosis, unchanged at C3-4.

These findings are age indeterminate.

dd:08/28/2023 4:18 PM

Reported by: Izadi, Kamron
Electronically signed by: Izadi, Kamron

Thank you for your kind referral. If you require further assistance, please contact our Radiologist Hotline at 855-RAD-TALK(855-723-8255).

MRI brachial plexus:
INDICATION: Date of injury: 1/7/2022. Fall at work. Numbness and tingling in the bilateral arms and hands. Patient reports right arm feels" dead ". Evaluate for atrophy.

COMPARISON: MR cervical spine 2/24/2022. MR bilateral shoulders 2/18/2022.

TECHNIQUE: Axial and oblique coronal T1, T2-weighted fat saturation and STIR images, and sagittal T2-weighted fat saturation images of the right brachial plexus was performed.

FINDINGS:

20260528035166

Quality: Diagnostic. Slightly limited without IV contrast.

Brachial plexus: The right cervical and brachial plexus nerve roots are well visualized without signal abnormalities, masses, along the course of these nerves, or within the axillary regions on either side. The bilateral neurovascular bundles do not have obvious compressive abnormalities within the interscalene triangle, the subpectoral reversal clavicular regions.

Soft tissues: There are no soft tissue masses or lymphadenopathy within the neck, supraclavicular, infraclavicular, or within the axillary regions on either side.

Muscles: No discrete muscle atrophy or myositis.

Lungs: No visualized apical lung masses.

Osseous structures:

Remote left clavicular fracture. Moderate bilateral acromioclavicular degenerative change.

Cervical spine: Moderate cervical degenerative change and facet arthropathy. Presumed spondylitic Modic type I endplate marrow edema C5-C6. This was not present on February 24, 2022 MR cervical spine. Lobulated tubular T2 hyperintensity ventral to the odontoid is unchanged from prior and nonspecific. This could reflect a vessel, lymphocele, or be related to C1-C2 degenerative change. Congenitally small cervical thecal sac due to foreshortened lamina. Large disc extrusions at C5-C6 and C6-C7 causing moderate to severe canal stenosis are grossly similar given the differences in technique but better visualized on the prior MR cervical spine. Small disc bulge at T1-T2, partially visualized, grossly similar.

Thyroid: There is a 1.3 cm right thyroid nodule.

Flow voids: Right vertebral artery flow void is congenitally small. Otherwise grossly preserved major cervical flow voids.

Visualized intracranial structures: Unremarkable.

Paranasal sinuses: There is a right inferior maxillary sinus 1.9 x 1.4 cm AP/CC T2 hyperintense ovoid lesion most consistent with a mucous retention cyst or polyp.

IMPRESSION:

1. Negative right brachial plexus for brachial plexus mass or significant noncontrast evidence of brachial plexopathy.

2. No discrete muscle atrophy or myositis as per clinical concern.

3. Presumed spondylitic Modic type I endplate marrow edema C5-C6. This was not present on February 24, 2022.

4. Lobulated tubular T2 hyperintensity ventral to the odontoid is unchanged from prior and nonspecific. This could reflect a vessel, lymphocele, or be related to C1-C2 degenerative change.

5. Congenitally small cervical thecal sac due to foreshortened lamina. Large disc extrusions at C5-C6 and C6-C7 causing moderate to severe canal stenosis are grossly similar given the differences in technique but better visualized on the prior MR cervical spine.

6. Remote left clavicular fracture and moderate bilateral AC degenerative change.

7. 1.3 cm right thyroid nodule.

Anne Marie McLellan, DO
CAQ Neuroradiology
CAQ Pediatric Radiology

dd:01/18/2023 11:31 AM

Reported by: Marie Mclellan, Anne DO
Electronically signed by: Marie McLellan, Anne

Thank you for your kind referral. If you require further assistance, please contact our Radiologist Hotline at 855-RAD-TALK(855-723-8255).

INDICATION: Cervicalgia. M54.2.

COMPARISON: None.

TECHNIQUE: 3 views of the cervical spine were obtained.

FINDINGS: Multiple views of the cervical spine reveal normal vertebral body heights. Alignment is normal.

There is no evidence of fracture. C5-C6 and C6-7 disc prostheses. The disc spaces are otherwise normal. No posterior element or facet joint abnormality is detected.

There is no significant arthritic change.
The prevertebral soft tissues are normal.

IMPRESSION:
1. Postsurgical changes as described.

dd:05/29/2024 3:39 PM

Reported by: Wennogle Jr, Charles M.D.
Electronically signed by: WENNOGLE JR, CHARLES

Thank you for your kind referral. If you require further assistance, please contact our Radiologist Hotline at 855-RAD-TALK(855-723-8255).

9/13/2024
INDICATION: Chronic neck pain

COMPARISON: None.

TECHNIQUE: Sagittal T1, sagittal STIR, sagittal and axial T2, and axial gradient echo images were obtained of the cervical spine.

FINDINGS:

There is straightening of the cervical spine.

The vertebral bodies are normal in height.

Status post anterior cervical discectomies with interbody fusions at C5/6 and C6/7. Disc desiccation and disc space narrowing at C2-3, C3-4 and C4-5.

The paraspinal soft tissues are normal.

The spinal cord signal is normal.

LEVEL BY LEVEL:

C1-C2: No significant degenerative changes. No canal stenosis.

C2-C3: 2 mm central disc protrusion with mild bilateral facet and left greater than right-sided uncovertebral enlargement. Mild-to-moderate left-sided neural foramen stenosis. No spinal canal or right neural foramen stenosis.

20260528035166

C3-C4: 3 mm ridge complex with mild-to-moderate bilateral facet and right greater than left-sided uncovertebral enlargement. Moderate to severe right and mild-to-moderate left-sided neural foramen stenosis with moderate spinal canal stenosis.

C4-C5: Mild-to-moderate bilateral uncovertebral enlargement and facet disease. Moderate bilateral neural foramen stenosis without spinal canal stenosis.

C5-C6: Interval ACDF at this level. Trace retrolisthesis of C5 on C6. 5 mm ridge complex with moderate bilateral uncovertebral enlargement. There is effacement of ventral and dorsal subarachnoid space. Moderate to severe spinal canal and bilateral neural foramen stenosis, not significantly changed. Type I Modic changes along the endplates.

C6-C7: Stable ACDF at this level. Left greater than right-sided uncovertebral enlargement and facet disease. Moderate to severe left and moderate right-sided neural foramen stenosis with mild-to-moderate spinal canal and bilateral lateral recess stenosis, now improved.

C7-T1: 1 mm disc bulge with mild bilateral uncovertebral enlargement and facet disease. Moderate bilateral neural foramen stenosis without spinal canal stenosis.

IMPRESSION:

1. Interval ACDF between C5 and C7. Trace retrolisthesis of C5 on C6. Spondylosis with moderate to severe spinal canal and bilateral neural foramen stenosis, unchanged. Type I Modic changes along the endplates at this level.

2. Moderate to severe left and moderate right-sided neural foramen stenosis with mild-to-moderate spinal canal and bilateral lateral recess stenosis at C6/7, now improved.

3. Remaining spondylosis as described above. Moderate bilateral neural foramen stenosis at C4-5.

4. Moderate to severe right and mild-to-moderate left-sided neural foramen stenosis with moderate spinal canal stenosis at C3-4.

Kamron Izadi, M.D.
Diplomate of the American Board of Radiology
Certificate of Added Qualification (CAQ), Neuroradiology

dd:09/13/2024 9:00 AM

Reported by: Izadi, Kamron M.D.
Electronically signed by: Izadi, Kamron

Thank you for your kind referral. If you require further assistance, please contact our Radiologist Hotline at 855-RAD-TALK(855-723-8255).

INDICATION: Right arm difficulty with movement

COMPARISON: None.

TECHNIQUE: Axial and oblique coronal T1, T2-weighted fat saturation and STIR images, and sagittal T2-weighted fat saturation images of the right brachial plexus was performed.

FINDINGS:

Limited by noncontrast technique and some motion artifact.

The right cervical and brachial plexus nerve roots are well visualized without signal abnormalities, masses, or abnormal enhancement identified along the course of these nerves, or within the axillary regions on either side. There are no soft tissue masses or lymphadenopathy within the neck, supraclavicular, infraclavicular, or within the axillary regions on either side. There are no traumatic cervical nerve root pseudomeningoceles identified at any level. The right neurovascular bundle is well visualized without compressive abnormalities identified within the interscalene triangle, or within the subpectoral or subclavian regions. The right clavicle is unremarkable. Osseous marrow is within normal limits.

There is disc pathology at C5/C6 encroaching on the bilateral neural foraminal regions with moderate to severe bilateral neural foramen stenosis. There is severe spinal canal stenosis at C5/6. Operative changes at C5/6 and C6/7 from prior fusion.

IMPRESSION:

1.There is disc pathology at C5/C6 encroaching on the bilateral neural foraminal regions with moderate to severe bilateral neural foramen stenosis. There is severe spinal canal stenosis at C5/6.

2. Normal right brachial plexus MRI examination.

Kamron Izadi, M.D.
Diplomate of the American Board of Radiology
Certificate of Added Qualification (CAQ), Neuroradiology

dd:08/13/2025 1:53 PM

Reported by: Izadi, Kamron M.D.
Electronically signed by: Izadi, Kamron

Thank you for your kind referral. If you require further assistance, please contact our Radiologist Hotline at 855-RAD-TALK(855-723-8255).

INDICATION: Cervicalgia, radiculopathy

COMPARISON: 9/12/2024 cervical MRI and other priors

TECHNIQUE: Sagittal T1, T2 and STIR images with axial T2 and axial gradient echo images were obtained of the cervical spine.

FINDINGS:
Cord: Normal cord signal.
CVJ: Craniovertebral junction is normal.
Alignment: Straightening of lordosis.
Marrow: Right C3-C4 bone marrow edema.
Anterior cervical discectomy and fusion from C5 through C7. Associated susceptibility artifact.
Paraspinal: Multiple small thyroid the largest measures 1 cm. nodules are stable.

Levels:
C1-C2: No stenosis.

C2-C3: Tiny central protrusion. Moderate left facet arthropathy.
Moderate left foraminal narrowing. Stable.

C3-C4: Tiny central disc protrusion. Uncovertebral spurring and facet arthropathy including edema and cystic change on the right which is new from prior.
Mild canal narrowing and cord flattening are stable. Mild left and severe right foraminal narrowing are stable.

C4-C5: Disc osteophyte complex, uncovertebral spurring and facet arthropathy including severe right facet arthropathy with ankylosis.
Moderate bilateral foraminal narrowing. Stable.

C5-C6: Disc osteophyte complex, uncovertebral spurring and mild facet arthropathy.
Severe canal narrowing with moderate cord flattening. Severe bilateral foraminal narrowing. Stable.

C6-C7: Disc osteophyte complex and uncovertebral spurring.
Moderate bilateral foraminal narrowing. Stable.

20260528035166
C7-T1: Facet arthropathy. Moderate bilateral foraminal narrowing is stable.

IMPRESSION:

Stable severe degenerative changes including severe canal narrowing at C5-C6.

dd:08/13/2025 11:50 AM

Reported by: Ebbert, Todd MD
Electronically signed by: Ebbert, Todd

Thank you for your kind referral. If you require further assistance, please contact our Radiologist Hotline at 855-RAD-TALK(855-723-8255).

## Plan

**Assessment/plan:**
The patient is a pleasant 58 yrs old presenting with cervical radiculopathy, cervical myelopathy, and significant neck pain. I personally reviewed his imaging report directly with the patient which shows large disc extrusions at C5-C6 and C6-C7 with severe canal stenosis. He states that his symptoms are debilitating and interfere with his daily activities. Given the long-standing nature of her symptoms, it is unlikely that these will improve without surgical intervention. Therefore, a significant amount of time was spent discussing the risks, alternatives and benefits of anterior surgical decompression and fusion at C5-7 with direct visualization. We discussed anterior and posterior cervical fixation and fusion approaches. Both anterior and posterior surgeries were discussed however posterior surgery would carry higher morbidity hence an anterior surgery was offered and elected by the patient. The proposed procedure, with its attendant risks, benefits and alternatives, was explained to the patient in advance, who asked that the procedure be performed. Both anterior and posterior surgeries were discussed however posterior surgery would carry higher morbidity hence an anterior surgery was offered and elected by the patient. I discussed the risks and benefits involving the operation with the patient. Risks included but not limited to infection, bleeding, wound dehiscence, spinal fluid leak, chronic pain, cosmetic disfigurement, damage or injury to spinal cord or nerves resulting in malfunction, no improvement and/or worsening of current symptoms, the development of spinal instability, risk of hospitalization-related complications, thromboembolic events, risk of brace-related complications, speech issues, swallowing difficulty, need for parenteral nutrition, development of pseudoarthrosis and fusion failure, adjacent segment disease, Horner's syndrome, development of failure of metal implants such as fracture, migration, pull out, loosening of screws, risk of hospitalization-related complications, thromboembolic events, risk of general anesthesia, and/or risks related to positioning on the operating room table such as facial swelling, orbital blindness, peripheral neuropathy, plexopathy, risk of general anesthesia and death. The patient voiced full understanding of the procedure and proceeded with informed consent. They also expressed understanding that posterior fixation might become necessary at a later date if the patient were to develop pseudoarthrosis or need for further fixation were to arise. The patient expressed understanding and voiced informed consent. They were also counseled on warning signs of cervical cord compression. We will follow-up with them for final surgical scheduling. We will obtain flexion extension cervical radiographs to rule out instability. He will follow-up in 4 weeks' time. All his questions were answered to his satisfaction.

5/30/2024
The patient presents in interval follow-up, now 4 weeks status post C5-7 ACDF. He states his post-surgical neck pain is slowly improved. He also reports he is experiencing increased spasms through his right upper extremity and numbness through his left hand. We reviewed his recently obtained cervical xrays, which reveal intact hardware without over evidence of loosening or malfunction. We discussed the chronicity of his symptoms preoperatively and the high likelihood of persistent symptoms postoperatively. However, it is too soon in his postoperative course to determine his precise outcome. At this time, we recommend the patient begin a dedicated cervical physical therapy regimen. We will provide the patient an additional prescription of pain medication and muscle relaxant for symptom relief. We discussed trialing gabapentin, which the patient declined given his poor past experience with the medication along with several other medications. We will see the patient again in 4 weeks for continued follow-up. He was amenable to the plan and instructed to call the office with any additional questions or concerns.

6/14/2024
The patient presents in interval follow up. He is now 8 weeks postop however his improvement has been slow. We would like to proceed with continued exercise therapy postoperatively. He is being asked to continue to stay as active as possible in the interim. We will see the patient again in 4 weeks.

7/19/2024
The patient presents in interval follow up. Unfortunately, he continues to have neck pain, hoarseness, and upper extremity weakness. We discussed the chronicity of his symptoms prior to surgery and the extent of his upper extremity weakness. We discussed the possibility of incomplete resolution as well as the amount of time it could take to continue to heal. We reviewed the purpose and importance of post operative physical therapy. He voiced understanding. All of his questions were answered to his

satisfaction. We will send a new referral for physical therapy of the cervical spine twice a week for 6 weeks. He will follow up in 4 weeks' time to review his progress.

9/13/2024
I reviewed the imaging directly with the patient showing significant improvement of the stenosis at C5-6 and C6-7. There are no new or worsening radiographic changes compared to his previous MRI. At this time, we would like the patient to follow up with Dr. Scott for continued pain management. We will send his latest records to Dr. Scott's office. We will send a referral to Help Therapy for depression evaluation and treatment. We will also send a referral to Dr. Shayya for migraine management and possible occipital blocks or botox injections. He was appreciative for the discussion and referrals. All of his questions were answered to his satisfaction. He will follow up in 4 weeks.

10/18/2024
The patient presents in interval follow up. He has established with Dr. Shayya and Dr. Scott. He plans on scheduling a visit with a counselor this week. Unfortunately, he continues to struggle greatly with his pain and upper extremity weakness. At this time, we recommend continuing migraine care with Dr. Shayya and pain management with Dr. Scott. We discussed in great detail again that due to the chronicity and severity of his weakness and overall cervical pathology prior to surgical intervention, his recovery is slowed and there is a high likelihood he will have incomplete resolution of his symptoms. He voiced understanding. We will send a referral to evaluate his right shoulder. The patient requested to not see Dr. Eifler. We will renew his prescription for physical therapy. He will follow up in 4 weeks.

11/15/2024
The patient presents in interval follow up. He is overall improved since his last visit as his migraines have resolved with the medication Dr. Shayya prescribed. We discussed the spinal cord stimulator including its risks, alternatives and benefits. The patient would like to consider his options for the SCS. He would like his shoulder to be evaluated prior to making a decision regarding the stimulator. We will send a referral to Dr. Eifler for right shoulder evaluation. He will follow up in 4 weeks.

12/27/2024
The patient presents in interval follow up. His migraines have significantly improved since seeing Dr. Shayya. He continues to participate in physical therapy. Unfortunately, his shoulder and psychology evaluation were denied. The patient possibly has an IME next month. At this time, he was encouraged to continue seeing Dr. Shayya, Dr. Scott, and his physical therapist. We discussed speaking with his attorney regarding his denials and possible IME. All of his questions were answered to his satisfaction. He will follow up in 4 weeks.

1/24/2025
The patient presents in interval follow up. At this time, we remain in a holding pattern for further treatment. We reviewed his IME and disagree with the diagnosis of Parsonage Turner. His diagnoses are fairly obvious, and he has undergone appropriate treatment for said diagnoses. He should continue physical therapy and seeing Dr. Scott and Dr. Shayya in the interim. All of his questions were answered to his satisfaction. He will follow up in 4 weeks.

2/28/2025
The patient presents in interval follow up. I reviewed his IME from Dr. Theller with orthopedics who did not feel he needed further shoulder evaluation with Dr. Eifler. He did recommend a neurology IME. At this time, we recommending continuing with physical therapy. We will procure his latest IME when available. All of his questions were answered to his satisfaction. He will follow up in 4 weeks.

3/28/2025
The patient presents in interval follow up. I reviewed the IME from Dr. Kahn who believes he has an acute onset of Parsonage Turner syndrome. He believes this is likely idiopathic or related to poor viral illness or vaccination. He does not believe he needs shoulder evaluation, further spine care, or neurology care as it related to his industrial injury. At this time, the patient was encouraged to speak with his attorney regarding the IME and next steps. The patient believes he has a hearing in a few months regarding shoulder evaluation approval. He should continue physical therapy for his cervical spine. We discussed advancing to MMI soon after his speaks with his attorney. He does not wish to proceed with a cervical spinal cord stimulator. All of his questions were answered to his satisfaction.

20260528035166

6/27/2025
The patient presents in interval follow up. His court hearing was postponed and is pending rescheduling. He continues to undergo physical therapy for his upper extremities. We discussed again from a cervical spine standpoint there are no further surgical interventions recommended. He voiced understanding and is appreciative for his surgery and overall recovery as his cervical pain



5-28-2026 7211446 5120260528035166

6/10/2026 7211446 5620260610023625CC0003

did significantly improve. We recommend continuing physical therapy as he does find it beneficial. He will speak to his attorney regarding his updated court hearing.

8/8/2025
The patient presents with worsening right arm weakness and neck pain. On exam, the patient has significant atrophy to his right arm. At this time, we will proceed with a MRI of the cervical spine without contrast and MRI of the brachial plexus without contrast. We will also obtain a CT scan of the chest without contrast for clinical decision making to rule out a pancoast issue. He will follow-up in 2 weeks' time to review his imaging report directly with the patient. All his questions were answered to his satisfaction. We discussed obtaining an EMG after reviewing his imaging results. He knows to contact our office with any questions or concerns. He was urged to the go to the nearest ED with Neurosurgery with any worsening or new neurological signs or symptoms.

Work status:
Off work

8/18/2025
The patient presents in interval follow-up with persitent right upper extremity weakness and neck pain. We reviewed his brachial plexus MRI which was negative and his cervical MRI which reveals stable degenerative changes. His chest CT is pending at this time. We therefore recommend continued conservative symptom management while we await the final report from his CT. We will see him again in 1-2 weeks to review his chest CT to definitively rule out Pancoast syndrome. He may need an EMG of his upper extremities given the weakness to rule out an underlying non-structural pathology. The patient's questions were answered to their satisfaction, they were amenable to the plan, and they were instructed to call the office with any further questions or concerns.

9/8/2025
The patient presents in interval follow-up with generally stable symptoms. His recent CT ruled out possible Pancoast Syndrome. At this time, we recommend proceeding with an EMG of his bilateral upper extremities. We discussed seeking the importance of maintaining adequate hydration and seeking emergent for any persistent syncopal events. We will see him again in 4 weeks for continued follow-up.

10/13/2025
The patient presents in interval follow-up. He reports a mild improvement of his right upper extremity symptoms after undergoing cupping recently. At this time, we recommend he proceed with his upper extremity EMG as previously recommended. We've provided 20 tablets of tramadol for additional symptom relief. We will see him again in 4 weeks for continued follow-up. The patient's questions were answered to their satisfaction, they were amenable to the plan, and they were instructed to call the office with any further questions or concerns.

11/17/2025
The patient presents in routine follow-up with increase neck and upper extremity radicular pain. He has not yet completed his recommend bilateral upper extremity EMG, but plans to schedule this today. We will see the patient again in 4 weeks for continued follow-up to review his EMG. The patient's questions were answered to their satisfaction, they were amenable to the plan, and they were instructed to call the office with any further questions or concerns.

12/22/2025
The patient presents in routine follow-up with stable symptoms. His EMG is consistent with bilateral severe C7 cervical radiculopathy and superimposed moderate bilateral carpal tunnel syndrome. Given the positive EMG findings and residual canal stenosis at C5-6, we held a lengthy discussion regarding his surgical treatment option of a posterior C4-T1 decompression and fusion.

Given the long-standing nature of his symptoms, it is unlikely that these will improve without surgical intervention. Therefore, a significant amount of time was spent discussing the risks and benefits of posterior surgical decompression and fusion with direct visualization. We discussed posterior cervical fixation and fusion approach. The proposed procedure, with its attendant risks, benefits and alternatives, was explained to the patient in advance, who asked that the procedure be performed. I discussed the risks and benefits involving the operation with the patient. Risks included but not limited to infection, bleeding, wound dehiscence, spinal fluid leak, chronic pain, cosmetic disfigurement, damage or injury to spinal cord or nerves resulting in malfunction, no improvement and/or worsening of current symptoms, the development of spinal instability, risk of hospitalization-related complications, thromboembolic events, risk of brace-related complications, speech issues, swallowing difficulty, need for parenteral nutrition, development of pseudoarthrosis and fusion failure, adjacent segment disease, Horner's syndrome, development of failure of metal implants such as fracture, migration, pull out, loosening of screws, risk of hospitalization-related complications, thromboembolic events, risk of general anesthesia, and/or risks related to positioning on the operating room table such as facial swelling, orbital blindness, peripheral neuropathy, plexopathy, risk of general anesthesia and death. The patient voiced full understanding of the

procedure. They also expressed understanding that posterior fixation might become necessary at a later date if the patient were to develop pseudoarthrosis or need for further fixation were to arise. The patient expressed understanding. They were also counseled on warning signs of cervical cord compression.

He would like to take additional time to consider surgical intervention. We will follow-up with him again in 4 weeks.

1/23/2026
The patient presents in routine follow-up with unchanged symptoms. He has multiple concerns in pursuing surgery both from a medical and psychosocial perspective. He would like to discuss these concerns further with his attorney. He remains undecided in pursuing the recommend C4-T1 posterior decompression and fusion (with laminectomy from C5-7). We've refilled his muscle relaxants in the interim and we will see the patient again in 4 weeks for continued follow-up. The patient's questions were answered to their satisfaction, they were amenable to the plan, and they were instructed to call the office with any further questions or concerns.

4/3/2026
The patient presents in interval follow-up with chronic symptoms and limited range of motion and strength of his upper extremities. He does not wish to pursue a surgical intervention as he is concerned about lack of support needed for a successful recovery and receiving potential denials for his care. Therefore, we recommend continued conservative symptom monitoring and management. A prescription of Percocet was provided. He will reach out to his attorney and we will see the patient again in 4 weeks to discuss progressing to MMI at that time. The patient's questions were answered to their satisfaction, they were amenable to the plan, and they were instructed to call the office with any further questions or concerns.

5/14/2026
The patient presents in routine follow-up with overall stable chronic symptoms. We once again discussed the risks, benefits and alternatives to surgical intervention as well as potential issues with not undergoing surgical intervention. He has elected to continue conservative symptom monitoring and management.

We would like to proceed with permanent restrictions at this time. We recommend a twice-yearly visit with the patient's neurosurgeon and 1 set of radiographs/CT/MRI with and without contrast per year as indicated. We also recommend 3 epidural steroid injections and visits with a pain management physician annually. We recommend a short course of NSAIDs, muscle relaxers and 12 sessions of PT yearly as indicated. In terms of the patient's activity restrictions, we recommend lifting no more than 10 pounds maximum and frequent breaks. The patient is also being asked to avoid prolonged cervical flexion and extension activities. The patient is being asked to lift no more than 10 pounds sustained. The patient is being asked to carry/pull/push no more than 10 pounds sustained. They patient is being asked to restrict his activities of lifting overhead. The patient is being asked to follow up with us on a 6-month basis moving forward. The patient's whole person impairment is 7% for continued radicular complaints. The supportive care award should continue for a period of 2 years.

Katherine Brown, NP
Abhishiek Sharma, MD

Dr. Sharma was immediately/physically available for consultation during this clinical encounter. Dr. Sharma personally discussed the above care plan and formulated it in conjunction with the nurse practitioner on the date of service.

I spent greater than 37 minutes face-to-face with the patient, over half in discussion of the diagnosis and the importance of compliance with the treatment plan, including but not limited to reviewing pertinent medical history, symptoms, and imaging.

This note has been partially created with Dragon voice recognition software. Occasional wrong-word substitutions may have occurred due to the inherent limitations of this software. Despite best efforts at reviewing & proof-reading the note, inadvertent errors may remain. Please read the chart carefully and recognize, using context, where such inadvertent substitutions may have occurred, and please let us know as soon as possible if any such errors have been noted, so that we may correct them. If you have any questions about the contents of this note, please contact us to discuss the case. Thank You.

REFERRALS:
General order Physical Therapy via Fax
REFERRALS:
Help Therapy Neuropsych via Fax

20260528035166

**Orders**

**LAB ORDERS**

No orders attached to this encounter.

**IMAGING ORDERS**

No orders attached to this encounter.

## Screenings/ Interventions/ Assessments

No screenings/interventions/assessments recorded.

practice fusion

# EXHIBIT G

Notices of Claim Status, June 10, 2026

# NOTICE OF SUPPORTIVE MEDICAL MAINTENANCE BENEFITS

**Carrier or Self-Insured Name and Address**
DG Retail LLC
13639 W Glendale Ave
Glendale Az 85307-2035

**Authorized Third Party Administrator (TPA) Name and Address**
Sedgwick Claims Management Services, Inc
P O Box 14493 Lexington, KY 40512-4493

**Claimant's Name and Address**
Mark L. Robison
C/O Christopher Gulinson 4001 N. 3Rd St, Suite 230
Phoenix AZ 85012

ICA Claim No. 20220280286
Soc. Sec. No. ***-**-5511
Carrier Claim No. 7211446
Employer DG Retail LLC
Address 13639 W Glendale Ave
Glendale Az 85307-2035
Date Injured 01/07/2022

SUPPORTIVE MEDICAL MAINTENANCE BENEFITS ARE AUTHORIZED BY THE ABOVE-NAMED INSURANCE CARRIER AS SET FORTH BELOW WHILE THE NEED FOR SUCH SUPPORTIVE CARE CONTINUES OR UNTIL FURTHER NOTICE.

Supportive Medical Maintenance:

Per attached medical report, recommended maintenance care consists of 2 x yearly visit with patient's neurosurgeon, 1 set of radiographs/CT/MRI per year as indicated, 3 epidural steroid injections, and visits with pain management physician annually. Short course of NSAIDS Muscle relaxers and 12 sessions PT yearly as indicated.

Treating Physicians(s):
Abhishlek Sharma, MD

Duration of Supportive Medical Maintenance:
2 years

IF CONDITION WORSENS REQUIRING ACTIVE MEDICAL CARE, A PETITION TO REOPEN MUST BE FILED WITH THE INDUSTRIAL COMMISSION. A.R.S. 23-1061(H).

MAILED ON: 06/10/2026

BY: Melissa Casady
(Authorized Representative) Tel. #: (303)713-6021

Copy to: Industrial Commission of Arizona

**NOTICE TO CLAIMANT: If you do not agree with this NOTICE or wish to have the Commission investigate and review the benefits provided in this NOTICE, you must file a request for investigation under A.R.S 23-1061(J) with either office of the Industrial Commission listed below. A request for investigation seeking review of a Notice of Supportive Medical Maintenance Benefits may be filed at any time under A.R.S. 23-1061(J).**

**AVISO AL RECLAMANTE: Si usted no esta de acuerdo con este AVISO, o si desea que la Comision investigue y haga una revision de los beneficios que se proveen en este AVISO, usted debera someter una solicitud de investigacion, de conformidad con A.R.S. 23-1061(J), en cualquiera de las oficinas de la Comision Industrial que se indican a continuacion. De conformidad con A.R.S. 23-1061(J), usted en cualquier momento puede someter una solicitud de investigacion para lograr que se revise un Aviso de Beneficios de Apoyo para Mantenimiento Medico.**

Phoenix Office: Industrial Commission of Arizona
800 W Washington Street
Phoenix, Arizona 85007-2922

PO Box 19070
Phoenix, AZ 85005-9070

Tucson Office: Industrial Commission of Arizona
2675 E Broadway
Tucson, Arizona 85716-5342

**THIS FORM APPROVED BY THE INDUSTRIAL COMMISSION OF ARIZONA FOR CARRIER USE**

Form ICA 0103 - Rev 6/2019

CLIENT'S COPY

6/10/2026 7211446 5620260610023625CC0003

# NOTICE OF PERMANENT DISABILITY
## AND REQUEST FOR DETERMINATION OF BENEFITS

| Carrier or Self-Insured Name and Address | |
|---|---|
| DG Retail LLC<br>13639 W Glendale Ave<br>Glendale Az 85307-2035 | ICA Claim No. 20220280286<br>Soc. Sec. No. ***-**-5511 |
| **Authorized Third Party Administrator Name and Address**<br>Sedgwick Claims Management Services, Inc<br>P O Box 14493<br>Lexington, KY 40512-4493 | Carrier Claim No. 7211446<br>Employer DG Retail LLC |
| **Claimant's Name and Address**<br>Mark L. Robison<br>C/O Christopher Gulinson 4001 N. 3Rd St, Suite 230<br>Phoenix AZ 85012 | Address 13639 W Glendale Ave<br>Glendale Az 85307-2035<br>Date Injured 01/07/2022 |

You are hereby notified of a permanent disability, pursuant to the provisions of A.R.S. 23-1047. The Industrial Commission of Arizona is hereby requested to examine this claim to determine the amount of further compensation, if any, to which claimant may be entitled. Copies of all pertinent reports necessary to make such a determination are herewith forwarded to the Commission.

The type of disability is:

1. Unscheduled permanent partial disability.

- [x] a. Pursuant to A.R.S. 23-1044-C
- [ ] b. Pursuant to A.R.S. 23-1065-B (Submit proof of prior scheduled award and termination date)
- [ ] c. Pursuant to A.R.S. 23-1065-C (Substantiating medical and employer verification attached)
- [ ] d. Pursuant to pre-1-1-86 apportionment statutes (Specify which section)

- [ ] 2. Permanent facial disfigurement or loss of teeth (Specify which category)
- [ ] 3. Fatal with non-enumerated dependents.
- [ ] 4. Fatal where dependents are only partially dependent upon deceased's earnings for support at time of injury.
- [ ] 5. Non-enumerated permanent total disability.
- [ ] 6. Advance payments voluntarily made will be credited against permanent compensation awarded. Advance payments will be as follows:

Please Provide Details: Claimant found to have sustained 7% with permanent restrictions

Mailed On: 06/10/2026 By: Melissa Casady

(Authorized Representative) Tel. #: (303)713-6021

Copy to: Industrial Commission of Arizona

Phoenix Office: Industrial Commission of Arizona
800 W Washington Street
Phoenix, Arizona 85007-2922

PO Box 19070
Phoenix, AZ 85005-9070

Tucson Office: Industrial Commission of Arizona
2675 E Broadway
Tucson, Arizona 85716-5342

THIS FORM APPROVED BY THE INDUSTRIAL COMMISSION OF ARIZONA FOR CARRIER USE

Form ICA 0106 - Rev 6/2019 INDUSTRIAL COMMISSION OF ARIZONA

CLIENT'S COPY

6/10/2026 7211446 5620260610023625CC0003

# NOTICE OF CLAIM STATUS

**Carrier or Self-Insured Name and Address**
Name: DG Retail LLC
Address: 13639 W Glendale Ave
City: Glendale State: Az Zip Code: 85307-2035

**Authorized Third Party Administrator (TPA) Name and Address**
Name: Sedgwick Claims Management Services, Inc
Address: P O Box 14493
City: Lexington State: Ky Zip Code: 40512-4493

**Employer Name, Address, & Policy Number**
Name: DG Retail LLC
Address: 13639 W Glendale Ave
City: Glendale State: Az Zip Code: 85307-2035
Policy Number: WCUC6781373A

This form addresses the lifecycle of a workers' compensation claim.
A.R.S.§23-1061(F) requires a notice of claim status for all status changes.
*Supporting medical documentation required to be included on all claims with wage loss greater than seven days and/or permanent impairment.

Claimant's Name: Mark L. Robison
Address incl Apt/Unit: C/O Christopher Gulinson, 4001 N. 3Rd St, Suite 230
City: Phoenix State: AZ Zip Code: 85012
Email Address:
Date of Birth: [redacted]
Social Security Number: ***-**-5511
Carrier Claim No: 7211446
ICA Claim No: 20220280286
Date of Injury: 01/07/2022

**Section One: New Claim**

☐ 1. Claim is accepted *(Continue to section two)*
☐ 2. Claim is denied. ☐ Denied over 21 days from ICA notification and A.R.S.§1061(M) penalty benefits apply. *(Continue to section two).*

**Section Two: Notice of First Payment**

☐ 3. No temporary compensation paid because the claimant has not currently sustained a temporary disability entitlement attributable to this injury beyond seven consecutive days.
4. Temporary or Permanent Disability owed or anticipated. *(complete one checkmark from below & select a or b below)*

Check One and: ☐ First compensation payment issued (check issued separately) ☐ Establishing Average Monthly Wage only.

Check One: ☐ a. Statutory minimum or estimated monthly wage pending determination of Average Monthly Wage within 30 days.
☐ b. Recommended Average Monthly Wage of $ ________ subject to final determination by the Industrial Commission of Arizona. See attached Recommended Average Monthly Wage Calculation.

**Section Three: Work Status - A.R.S.§23-1061(F)**

☐ 5. a. No Work Status effective ________ . Per A.R.S.§23-1062(D) benefits are payable at least every fourteen calendar days.
☐ b. Released to light duty effective ________ . When owed, Per A.R.S.§23-1044(A) and A.R.S.§23-1062(D) benefits are payable at least monthly. Supporting documentation attached*.
☐ c. Released to regular work effective ________ .Supporting documentation attached*.

**Section Four: Discharge from Active Care**

☒ 6. Temporary Compensation and active medical treatment terminated on 06/10/2026 because claimant was discharged.
*(when 6. checked, must also check 7. or 8. below)*
☐ 7. Injury resulted in no permanent disability. Supporting documentation attached*
☒ 8. Injury resulted in permanent disability. Supporting medical documentation and Notice of Permanent Disability Benefits attached. Supportive care, if any,will be authorized by separate Notice of Supportive Medical Maintenance Benefits.

**Section Five: Petition to Reopen**

☐ 9. Petition to Reopen accepted.
☐ 10. Petition to Reopen denied. ☐ Denied over 21 days from ICA notification and A.R.S.§1061(M) penalty benefits apply.

**Section Six: Other**

☐ 11. Other: Claimant found permanent and stationary as of 5/13/26.
☐ 12. Rescinding Notice of Claims Status Dated ________
☐ 13. Amending Notice of Claims Status Dated ________ Correction: ________

**Claims Handling Representative**
Sent on: 06/10/2026
Email Address: Melissa.Casady@sedgwick.com
Direct Tel# and Ext: (303)713-6021
Decision By: Melissa Casady
Adjuster ID: A28293
☒ Copy distributed to Employee, Employer & Commission per A.R.S.§1061(F)

**NOTICE TO CLAIMANT: If you do not agree with this NOTICE and wish a hearing on the matter, your written Request for Hearing must be received at either office of the Industrial Commission listed below within NINETY (90) DAYS after the date of mailing of this Notice, pursuant to A.R.S. 23-941 and 23-947. IF NO SUCH APPLICATION IS RECEIVED WITHIN THAT NINETY DAY PERIOD, THIS NOTICE IS FINAL.**

**AVISO AL RECLAMANTE: Si usted no esta de acuerdo con este AVISO, y desea una audiencia en este caso, su peticion por escrito pidlendo una audiencia debera ser recibida en cualquira de las oficinas de la Comision Industrial a las direcciones abajo indicadas dentro de NOVENTA (90) DIAS despues de la fecha de este AVISO, de acuerdo con las leyes A.R.S. 23-941 y 23-947. SI DICHA PETICION NO ESTA RECIBIDA DENTRO DEL PERIODO DE NOVENTA (90) DIAS, ESTE AVISO SERA CONSIDERADO FINAL.**

INDUSTRIAL COMMISSION OF ARIZONA

For Assistance & Information Please Contact:
Phone: 602-542-4661
Email: Help@azica.gov Ayuda@azica.gov
Claims@azica.gov
Website: https://www.azica.gov

In Person: Industrial Commission of Arizona
800 W Washington St
Phoenix, Arizona 85007-2922

2675 E Broadway
Tucson, Arizona 85716-5342

Submission:
Mail:
Industrial Commission of Arizona PO BOX 19070
Phoenix AZ 85005
Fax: 602-542-3373
Webform available online

Form ICA 0104 - Rev 4/2025 THIS FORM APPROVED BY THE INDUSTRIAL COMMISSION OF ARIZONA FOR CARRIER USE

CLIENT'S COPY

6/10/2026 7211446 5620260610023625CC0003

# EXHIBIT H

Notice of Removal, Peoples v. DG Retail, LLC (S.D. Ill.)

**IN THE UNITED STATES DISRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| BARBARA PEOPLES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 22-2468 |
| | ) | |
| DG RETAIL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**NOTICE OF REMOVAL**

COMES NOW Defendant DG Retail, LLC, by and through its undersigned attorney, Jeffrey A. Kopis of Jerome, Salmi & Kopis, LLC, and hereby files its Notice of Removal, stating the following:

1. A civil action has been commenced and is now pending in the Circuit Court of Jefferson County, State of Illinois, Case No. 2022-LA-29, wherein Barbara Peoples is the Plaintiff and DG Retail, LLC is the Defendant. (A copy of the Complaint at Law is attached hereto and incorporated herein as Defendant's Exhibit A.)

2. The action is a civil action wherein Plaintiff pleads damages for personal injuries because of Defendant's alleged negligence in connection with a fall occurring on August 27, 2020.

3. Defendant, DG Retail, LLC was served a copy of the initial pleading on or about August 17, 2022.

4. This action is a civil action, of which the United States District Court has original jurisdiction pursuant to 28 U.S.C. §1332 and is one which may be removed to this Court by Defendant DG Retail, LLC, pursuant to 28 U.S.C. §1441, in that this is a civil action or proceeding involving diversity of citizenship.

5. Plaintiff Barbara Peoples is a citizen of Illinois.

6. Defendant DG Retail, LLC is a Single Member LLC formed under the laws of the State of Tennessee.

7. The Single Member and Owner of DG Retail, LLC is Dolgencorp of Texas, Inc.

8. Dolgencorp of Texas, Inc is a C Corporation incorporated in the State of Kentucky.

9. Dolgencorp of Texas, Inc., has its principal place of business in the State of Tennessee.

10. Since Dolgencorp of Texas, Inc., is incorporated in the State of Kentucky and has its principal place of business in the State of Tennessee, then Dolgencorp of Texas, Inc., for diversity purposes, is a Citizen of the State of Tennessee and a Citizen of the State of Kentucky.

11. Since Dolgencorp of Texas, Inc is both a Citizen of the State of Kentucky and the State of Tennessee and it is the sole member and owner of Defendant DG Retail LLC, then Defendant, DG Retail, LLC, is both a Citizen of the State of Kentucky and a Citizen of the State of Tennessee. (<u>Copeland v. Penske Logistics</u>, LLC, 675 F.3d 1040, 1043 (7th Cir. 2012) ("a limited liability company's citizenship includes every state of which any unit holder is a citizen").

12. Therefore, there is complete diversity of citizenship between the Plaintiff, Barbara Peoples, and the Defendant.

13. Plaintiff prayed in her ad damnum of her Complaint at Law that she was seeking a sum not exceeding $50,000.00 which is why Defendant did not seek to remove the case within the time for filing its answer.

14. Defendant served Plaintiff a Request for Admissions pursuant to Illinois Supreme Court Rule 216 on September 15, 2022.

15. The Request for Admissions asked to the Plaintiff to admit that she was seeking in excess of $75,000.00 from this Defendant to compensate her for her injuries.

16. On October 12, 2022, the Plaintiff's attorney provided the following the response:

> "Plaintiff objects to this request as it is not related to a fact under the law. **The complaint is quite clear as to the amounts sought by the plaintiff in this litigation. (Emphasis added.)**" (Plaintiff's response is attached hereto and incorporated herein as Exhibit B.)

17. Although the Plaintiff's attorney initially objects to the Request, he continues to provide an answer to the Request to Admit by answering that "The complaint is quite clear as to the amounts sought by the plaintiff in this litigation."

18. Said answer is clearly a denial to the Request, but this denial was not verified by the Plaintiff.

19. Illinois Supreme Court Rule 216 specifically states in part as follows:

> "Each of the matters of fact and the genuineness of each document of which admission is requested **is admitted unless within 28 days after service thereof, the party to whom the request is directed serves upon the party requesting the admission either (1) a sworn statement denying specifically the matters of which admission is requested** or setting forth in detail the reasons why the party cannot truthfully admit or deny those matters or (2) written objections….. Illinois Supreme Court Rule 216 (c)."

20. As noted above, Plaintiff failed to provide a sworn denial to Defendant's Request within 28 days of being served and therefore said Request is deemed admitted.

21. Based upon this admission, the amount in controversy is in excess of $75,000.00 meeting the jurisdictional requirements of this Court.

22. Further, although Defendant's removal is beyond the initial answer date, Section 1446 (b)(3) provides:

> "Except as provided in subsection (c), if the cases stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order **or other paper** from which it may first be ascertained that the case is one which is or has become removable. 28 Section 1446 (b)(3). (**Emphasis added**.)"

23. In this case, the “other paper” is Plaintiff’s unverified answer to Defendant’s Request for Admissions which was not served upon the Defendant until October 12, 2022.

24. Defendant is removing this matter within the required 30 days of being served Plaintiff’s unverified answer.

25. Therefore, this District Court of the United States has original jurisdiction of the claims made in Plaintiff’s Petition pursuant to 28 U.S.C. §1332 in that: (1) the Plaintiff is a citizen of the State of Illinois; (2) Defendant is not a citizen of the State of Illinois; and (3) the amount in controversy exceeds $75,000.00.

26. Written notice of the filing of this Notice of Removal and a copy of the Notice of Removal are being served upon the Plaintiff as required by law.

27. A copy of the Notice of Filing of Notice of Removal and the Notice of Removal are being filed with the Circuit Court of Jefferson County, State of Illinois as required by law.

28. Defendant DG Retail, LLC further files herein a certified copy of the Jefferson County Court file, Cause No. 2022-LA-29, attached hereto and incorporated herein as Defendant’s Exhibit C.

WHEREFORE Defendant DG Retail, LLC prays the Court accept its Notice of Removal, and make and enter such orders as may be necessary to effect the complete removal of this action from the Circuit Court of Jefferson County, Illinois to the United States District Court for the Southern District of Illinois, and that further proceedings be discontinued in the State Court, and all future proceedings be held in this Court, as the laws in such case provide.

Respectfully submitted,

By: /s/ Jeffrey A. Kopis
Jeffrey A. Kopis, #6211025
JEROME, SALMI & KOPIS, LLC
331 Salem Place, Suite 260
Fairview Heights, IL 62208
(618) 726- 2222
(618) 230- 3331 (Fax)
jkopis@jsklawfirm.com
*Attorneys for Defendant DG Retail, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2022, the above document was filed electronically with the Clerk of the Court to be served on all parties receiving notice via the operation of the Court's electronic filing system, and via electronic mail upon the following:

Jeffrey S. Deutschman
Bradley A. Skafish
DEUTSCHMAN & SKAFISH, P.C.
77 West Washington Street – Suite 1525
Chicago, IL 60602
(312) 419-1600
jeff@deutschmanlaw.com
brad@deutschmanlaw.com

/s/ Jeffrey A. Kopis

# EXHIBIT I

Dollar General Corporation Form 10-K Cover Page

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

☒ **Annual Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the fiscal year ended January 30, 2026, or**

☐ **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the transition period from ________ to ________**

**Commission file number: 001-11421**

# DOLLAR GENERAL CORPORATION

*(Exact name of registrant as specified in its charter)*

| **TENNESSEE** | **61-0502302** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**100 MISSION RIDGE**
**GOODLETTSVILLE, TN 37072**
*(Address of principal executive offices, zip code)*

Registrant's telephone number, including area code: **(615) 855-4000**

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.875 per share | DG | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | |
| Non-accelerated filer ☐ | Smaller reporting company ☐ | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The aggregate market value of the registrant's common stock outstanding and held by non-affiliates as of August 1, 2025 was $21.1 billion calculated using the closing market price of the registrant's common stock as reported on the NYSE on such date ($108.53). For this purpose, directors, executive officers and greater than 10% record shareholders are considered the affiliates of the registrant.

The registrant had 220,226,320 shares of common stock outstanding as of March 18, 2026.

**DOCUMENTS INCORPORATED BY REFERENCE**

Certain of the information required in Part III of this Form 10-K is incorporated by reference to the registrant's definitive proxy statement to be filed for the Annual Meeting of Shareholders to be held on May 28, 2026.

# EXHIBIT J

Notice of Claim Status, August 22, 2022

Received by ICA on 08/22/2022 12:00:00 AM

Submitted on 08/24/2022 06:19:44 PM

# NOTICE OF CLAIM STATUS

**Carrier or Self-Insured Name and Address**
Dollar General Corporation
100 Mission Ridge
Goodlettsville, TN 37072

**Authorized Third Party Administrator (TPA) Name and Address**
Sedgwick
P.O. Box 619079
Roseville, CA 95661

**Claimant's Name and Address**
Mark L Robison
16043 W State Ave
Litchfield, AZ 85340

ICA Claim No. 20220280286

Soc. Sec. No. [redacted]

**SSN not required if correct ICA claim number is provided**

Carrier Claim No. 7211446

Employer Dollar General Corporation

Address 100 Mission Ridge Dr
Goodlettsville, TN 37072

Date of Injury 01/07/2022

- ☑ 1. Claim is accepted.
- ☐ 2. Claim is denied.
- ☑ 3. No temporary compensation paid because the claimant has not currently sustained a temporary disability entitlement attributable to this injury beyond seven consecutive days.
- ☐ 4. Enclosed check for ______________ for period of ______________ through ______________. Seven days deducted if disability is less than 14 calendar days. Payment has been made based on 66 ⅔ percent of the wage of ______________ based on the following:
  - ☐ A. Statutory minimum or estimated monthly wage pending determination of Average Monthly Wage within 30 days.
  - ☐ B. Average monthly wage at time of injury (see attached calculation), subject to final determination by the Industrial Commission of Arizona within 30 days.
- ☐ 5. Return to light duty effective ______________. Per A.R.S. §23-1044(A) and A.R.S. §23-1062(D) benefits are payable at least monthly. Return to regular duty effective ______________.
- ☐ 6. Temporary compensation and active medical treatment terminated on ______________ because claimant was discharged.
- ☐ 7. Injury resulted in no permanent disability.
- ☐ 8. Injury resulted in permanent disability. Amount of permanent benefits, if any, and supportive medical maintenance benefits, if any, will be authorized by separate Notice.
- ☐ 9. Petition to Reopen accepted.
- ☐ 10. Petition to Reopen denied.
- ☑ 11. Other: Liability limited to bilateral shoulder strains only.

Mailed on: 08/22/2022 By: Linda Scott

Copy to: Industrial Commission of Arizona (Authorized Representative) Tel. #: 480-606-5580

The insurance carrier/employer will, upon request, provide claimant a copy of the medical report to support Findings 5, 6, 7 or 8.

**NOTICE TO CLAIMANT: If you do not agree with this NOTICE and wish a hearing on the matter, your written Request for Hearing must be received at either office of the Industrial Commission listed below within NINETY (90) DAYS after the date of mailing of this Notice, pursuant to A.R.S. 23-941 and 23-947. IF NO SUCH APPLICATION IS RECEIVED WITHIN THAT NINETY DAY PERIOD, THIS NOTICE IS FINAL.**

**AVISO AL RECLAMANTE: Si usted no esta de acuerdo con este AVISO, y desea una audiencia en este caso, su peticion por escrito pidiendo una audiencia debera ser recibida en cualquira de las oficinas de la Comision Industrial a las direcciones abajo indicadas dentro de NOVENTA (90) DIAS despues de la fecha de este AVISO, de acuerdo con las leyes A.R.S. 23-941 y 23-947. SI DICHA PETICION NO ESTA RECIBIDA DENTRO DEL PERIODO DE NOVENTA (90) DIAS, ESTE AVISO SERA CONSIDERADO FINAL.**

Phoenix Office: Industrial Commission of Arizona
800 W Washington Street

PO Box 19070
Phoenix, AZ 85005-9070

Tucson Office: Industrial Commission of Arizona
2675 E Broadway
Tucson, Arizona 85716-5342

**THIS FORM APPROVED BY THE INDUSTRIAL COMMISSION OF ARIZONA FOR CARRIER USE**

# EXHIBIT K

Decision Upon Hearing and Findings and Award, December 29, 2023

# BEFORE THE INDUSTRIAL COMMISSION OF ARIZONA

| | |
|---|---|
| MARK ROBINSON,<br>Applicant,<br><br>vs.<br><br>DOLLAR GENERAL,<br>Defendant Employer,<br><br>DG RETAIL LLC,<br>Defendant Insurance Carrier. | ICA Claim No. 20220280286<br>Ins. Claim No. 7211446<br>Date of Injury: 1/7/2022<br>ALJ Case No. ALJ0027425<br><br>**DECISION UPON HEARING AND FINDINGS AND AWARD** |

Applicant sustained an industrial injury on January 7, 2022. By Notice dated March 22, 2022, the claim was accepted as no time loss with liability limited to bilateral shoulder strains only. On August 1, 2023, Applicant requested a hearing under A.R.S. §23-1061(J) alleging failure to approve treatment, and alleging the Notice dated March 22, 2022, was void.

Formal hearing was held remotely on October 2, 2023, and Further Hearing was set for December 26, 2023. On December 26, 2023, Defendants advised they have agreed to approve Applicant's requested treatment, thus resolving all issues for hearing, Applicant agreed, and the Further Hearing was cancelled. Applicant is represented by Nathan Zollinger. Defendants are represented by Jens Omdahl.

The undersigned, having fully considered the file, records and all related matters, now enters FINDINGS AND AWARD as follows:

## FINDINGS

1. Hearing was held on October 2, 2023.
2. On December 26, 2023, Defendants advised they have agreed to approve Applicant's requested treatment, thus resolving all issues for hearing, and Applicant agreed.
3. Considering resolution of the claim, further hearing set for **10:00 AM** on **12/26/2023** has been **CANCELLED**.

## AWARD

**IT IS ORDERED** dismissing Applicant's Request for Hearing dated August 1, 2023, and no further action be taken on Applicant's August 1, 2023, Request for Hearing under A.R.S. §23-1061(J).

**IT IS FURTHER ORDERED** all further hearings scheduled in this matter are cancelled.

------------------------

**NOTICE:** Any party dissatisfied with this award may file a written request for review of the same with the Administrative Law Judge Division of the Industrial Commission within THIRTY (30) DAYS after the mailing of this award as provided by Arizona Revised Statutes, §§ 23-942D and 23-943A and B. Unless such written request is made within the time provided, this award is final.

The Industrial Commission of Arizona

Jeanne M. Steiner
Administrative Law Judge
(602) 542-3915
Date Signed: December 29, 2023

The Industrial Commission complies with the Americans with Disabilities Act of 1990. If you need this document in an alternative format, call (602) 542-5241.

# THE INDUSTRIAL COMMISSION OF ARIZONA

## NOTICE OF SERVICE

The attached DECISION UPON HEARING AND FINDINGS AND AWARD was placed in, and is now a part of, the Commission file, and a copy thereof was served upon all parties hereinafter named on 01/02/2024 (1) by depositing copies in the United States Mail in postage-prepaid, sealed envelopes addressed to such parties at the addresses shown below; or (2) if parties have waived service by United States Mail and specifically authorized alternative forms of service, by serving copies in the manners specifically authorized (designated below):

NATHAN ZOLLINGER,ESQ.
PO BOX 1750
PHOENIX, AZ 85001
VIA SFTP
Counsel for Applicant

JENS OMDAL, ESQ.
2415 E CAMELBACK RD STE 700
PHOENIX, AZ 85016
VIA U.S. Mail
Counsel for Defendants